---

## THE ODER.

*(Circuit Court, E. D. New York.   July 22, 1882.)*

COLLISION—SAIL-VESSEL IN FAULT—NEGLECT TO SHOW LIGHTS.

Where a steam-ship in mid-ocean, on a dark night, was approaching a bark from aft in a course that rendered it impossible for her lookouts to see the regulation-lights of the bark, but the lights of the steamer were in full view of those on the bark, who knew her to be a steamer approaching the bark on a course crossing her course, so as to involve the risk of collision, yet those on the bark, though having ample time so to do, did \not show any light or give any other warning to the steam-ship to notify her in time of the position of the bark, and the steam-ship, immediately on discovering the bark, threw her wheel hard a-port, and, at the same time, backed at full speed, but too late to avoid collision, *held*, that the bark was alone in fault, and that the libel against the steamer be dismissed.

*Henry T. Wing*, for libelants.

*William G. Choate*, for claimant.

In this case I find the following facts:

On the night of June 7, 1879, a collision occurred in the Atlantic ocean, to the eastward of the Grand Banks, in about latitude 48 deg. 1 min. N. and longitude 38 deg. 9 min. W., between the libelant's bark, the Collector, and the claimant's steam-ship, the Oder. The night was dark, and it was somewhat overcast at times, and no stars or moon were visible, but the lights of vessels, of ordinary brilliancy, and properly set and burning brightly, could be seen at a dis-

tance of from one to two miles. The wind was blowing a moderate breeze from not further S. than W. by S., and from not further N. than W. by N., and the bark was sailing at a speed of from four to five knots an hour, close-hauled upon the wind, and sailing by the wind, with all her sails set and drawing on the port tack. She was well manned, and had good and sufficient lights, properly set, and conforming to the regulations, and burning brightly. The mast-head light of the steam-ship was discovered by those on board of the bark four or five minutes before the collision, on the starboard quarter of the bark, and very soon thereafter the red light and then the green light of the steam-ship were successively seen, so that all three of said lights were visible at the same time, and then the green light was hidden shortly before the collision, as the steam-ship came along-side of the bark, and the red and white lights continued all the time open to the full view of those on the bark.

The bark kept her course, and the steam-ship threw her wheel hard a-port just before the collision, immediately upon discovering the bark, and at the same time backed at full speed; but the time before the collision was so short that her heading was not materially changed under her port wheel. and she struck the bark a heavy blow with her stem on the starboard side, between her fore and main rigging, cutting her down so that she sank in a few minutes and became a total loss, five of her crew being drowned thereby, and the rest of her officers and crew being rescued and taken on board of the steam-ship, but losing all of their property on board except the clothes which they had on at the time.

The steam-ship was running at a speed of between 11 and 12 knots an hour, on a course W. by N. $\frac{1}{4}$ N. As the vessels were approaching each other, the green light of the bark was not visible to the steam-ship, the line of her approach, from the time the green light of the bark would, if open to her, have become visible, being more than two points abaft the starboard beam of the bark. The steamer, from the aforesaid view of her lights by those on board of the bark, was known by them to be a steamer approaching the bark on a course crossing her course, so as to involve the risk of collision, and was so seen to be approaching on a line more than two points abaft the beam of the bark, on the starboard hand, and out of view of either of the regulation lights of the bark, and to be overhauling the bark, yet those on the bark, though having ample time so to do after seeing and knowing what was so seen and known by them, did not show any light or give any other warning to the steamer to notify her in time of the position of the bark.

The steamer was well manned and equipped. She had a bright mast-head light, which could be seen in clear weather about five miles, and good side lights, properly set and brightly burning, which could have been seen in clear weather about three miles. She had two competent seamen forward on the lookout, who were carefully attending to their duties. The second officer was on the bridge, keeping a good lookout, and carefully attending to his duty as officer of the deck, and the other officers and men of the watch were carefully attending to their duties. The steamer kept her said course till the discovery of the bark, which was made simultaneously by the second and fourth officers on the bridge, and the lookouts, seeming very near to them, and on the port

bow the shine or glimmer of a light, which, however, was so indistinct that its color could not immediately be discerned. Upon seeing this glimmer of a light the second officer immediately gave, in immediate and rapid succession, the order "hard a-port," to the wheelsmen, and the orders to stop and back at full speed to the engineer, which orders were instantly and promptly obeyed, but before the steamer could be stopped the collision took place. The libelants sustained by the collision the damages found by the district court. The steamer sustained no material damage.

On the foregoing facts I find the following conclusions of law:

The bark was in fault in not showing a light, or giving some other warning, in time, to the approaching steamer. There was no fault on the part of the steamer. The bark was wholly responsible for the collision.

The claimant is entitled to a dismissal of the libel, with costs to it in the district court and in this court.

SAML. BLATCHFORD, Circuit Justice.

BLATCHFORD, Justice. The libel alleges that at the time of the collision "the wind was blowing a moderate breeze from the westward," and that the bark was "on her port tack, close-hauled by the wind, on a course by the compass north by west." The libel does not otherwise state the direction of the wind. The answer admits that the breeze was light, and alleges that the wind "was from west by north." It also alleges that the steamer was on a course west by north, half west; that there was no light on the bark which was seen, or which could have been seen, by any one on board of the steamer sooner than the light seen was seen; that "notwithstanding the most vigilant and unremitting scrutiny of the lookouts and the second officer of said steam-ship, they could not discover said bark at any earlier moment than they did;" that the bark "had no light whatever which could, by any possibility, have been discovered by those on board said steam-ship until the latter had reached the point where her lookouts and second officer did in fact discover one, and that no sound or signal was given by those on board of said bark, but she was suffered to glide on in silence and darkness, a comparatively small and dark object, wholly invisible to a vessel approaching her from abaft, as said steam-ship was approaching her.

The petition of appeal of the claimant states that the appellant intends to make new allegations in the circuit court. The collision occurred June 7, 1879. The libel was filed June 19, 1879. The answer was filed July 2, 1879. The depositions of eight witnesses for the libelants were taken in July, 1879, at New York, and those of seven witnesses for the claimant were taken in September, 1879, at New York.

They were all taken out of court, before a commissioner, in writing, and read at the trial. There was no oral testimony in the case delivered in open court before the district judge. The trial took place in April, 1881. The district judge gave a written decision in July, 1881, and an interlocutory decree in favor of the libelants was entered July 25, 1881. A final decree was entered April 17, 1882, awarding to the libelants $21,285.13 as damages and interest, and $744.43 as costs. On the twentieth of April, 1882, the claimant filed a notice of appeal, and on the twenty-sixth of April, 1882, a petition of appeal. On the eighteenth of May, 1882, the claimant, in this court, gave notice to the libelants of an application to file an amended answer. Such amended answer, sworn to on the seventeenth of May, 1882, by the same person, as attorney in fact for the claimant, who swore to the original answer on the first of July, 1879, was presented to this court at the time the case was heard on the appeal, and leave was asked to file it, founded on an affidavit made by one of the proctors for the claimant.

The material differences between the amended answer and the original answer are the allegation that the wind was "about W. by S.," instead of "from W. to N.," and the allegation that the course of the steamer was "W. by N. ¼ N.," instead of "W. by N. ½ W." The amended answer also contains the following averments not found in the original answer:

"That from the time said bark came within such distance that those on board the said steamer could have seen her light, or lights, if they had been visible, till the collision, said steamer was more than two points abaft the beam, upon the starboard quarter of said bark, and for that reason the starboard side light of said bark, if burning and properly placed, was invisible to those on the steamer until the vessels were very near together, when the glimmer of said light, or of some other light, in or upon said bark, was faintly seen, and immediately afterwards the said bark herself was seen; nor did said bark show to said steamer, as she approached, any light, or give any other signal or indication of her presence or position;" [and as a specification of negligence in the bark causing the collision,] " that although the lights of said steamer were plainly visible to those on board of said bark for full five minutes before said collision, and said steamer was evidently approaching said bark on a course intersecting the course of said bark, so as to involve risk of collision, and at such an angle on the starboard quarter of said bark that the light of said bark was not visible to those on said steamer, the said steamer bearing from said bark more than two points abaft her beam, yet those on said bark showed no flash or other light to said steamer, nor made any signal of any kind to those in charge of said steamer of the position and course of said bark, who could not, except by means of such a light, discover said bark in time to avoid her by any movement on said steamer's part."

The following specification of negligence in the bark, causing the collision, contained in the original answer, is omitted in the amended answer:

"That neither the man forward nor any one on said bark discovered said steam-ship till her whistle was blown, though she was a large passenger ship, 375 feet in length, of great tonnage, rising high out of the water, and brilliant with lights, which those in charge of said bark could and would have seen, had they been attending to their duty, in time to have warned said steam-ship of the presence of the bark, and thus have enabled her to discover and avoid her."

It is not necessary to refer to the other proposed variations between the original answer and the amended answer. The libel contains averments that "when said steam-ship was first seen by those on board of said bark she presented her mast-head light, and shortly afterwards all three of her lights simultaneously to view, and was coming under full headway for the stern part of the starboard quarter of said bark," and that she then "hid her green light and opened her red light to full view of those on said bark." These allegations are denied by the original answer and the amended answer.

The affidavit referred to says:

"The information upon which I drew the answer touching the course of the steamer was derived from the original statement made by the second officer, who was in charge of the deck at the time of the collision, taken down in my office and in my presence, which statement is now before me, and is in the following words: 'The Oder was bearing W. by N. a quarter N.' I am unable to account for the mistake in the answer, but presume that the blunder must have occurred when I was dictating to the stenographer the draft answer. This mistake wholly escaped my attention till after the trial of the case in the district court was concluded, and the opinion of the judge thereon rendered. The libel stated that the bark was close-hauled on the port tack, and that 'the wind was blowing a moderate breeze from the westward.' My information as to the wind when I drew the answer was that given by the second officer in his statement taken down in my office, to which I have already referred, that the wind was 'W. by N.,' and I so inserted it in the answer without particularly considering the effect of the averment in relation to the course of the bark. The proof was that the steam-ship was moving at the rate of about 11 or 12 knots an hour, and that the wind was light, not exceeding a four or five knot breeze. Therefore, the judgment of the second officer as to the direction of the wind was of little or no moment, such a wind being to him of necessity apparently a head wind, or about W. by N. as the steamer was running. One of the material questions in the case raised on the argument, and submitted to the court upon the testimony, was whether the green light of the bark was open to the approaching steamer; the contention of the claimant being that the clear preponderance of the evidence was that the line of her

approach to the bark was very much more than two points abaft the beam. Indeed, this was assumed by me from the testimony of the witnesses for the libelants, as well as that of the claimant, confirmed and illustrated by the diagram used by the libelants on the trial, which is a part of the evidence in this cause. Therefore, neither the precise course of the steamer nor the precise course of the bark seem to me in that aspect of the case to be material, inasmuch as the facts stated by the witnesses for the libelants in connection with the diagram were inconsistent with any other view than that the approach of the steamer was all the while from a point far abaft two points abaft the beam; but to my surprise the opinion of the court upon the question of the line on which the steamer approached the bark gives almost a conclusive effect to the statement of the steamer's course, and of the direction of the wind as controlling the course of the bark as given in the answer. The amended answer now proposed to be filed in this court differs in its statement of fact from the former answer in no material respect, except in correcting the aforesaid mistake as to the steamer's course, and in stating that the wind was about W. by S., instead of about W. by N. The claimant's proctors desire to raise in this court the same question raised below—whether the green light of the bark was open to the approaching steamer—disembarrassed of the aforesaid mistaken and erroneous averment of the former answer as to the course of the steamer, and the admission contained in the former answer as to the course of the wind, which was based upon no certain knowledge, and is proved by the evidence to have been incorrect. I verily believe, and we expect to be able to satisfy this court, that the amended answer more truly states the facts of the case as shown upon the trial than the former answer, and the amended answer sets up no new point by way of defense not argued and relied upon in the trial in the district court, the amendments being in accordance with what I conceive to be the real facts as clearly proved by the evidence."

The brief submitted to the district court on the part of the claimant contended that the course of the steamer was W. by N. ½ N.; that the light of the steamer was seen by the man at the wheel of the bark four or five minutes before the collision, and more than long enough to have enabled the steamer to clear the bark, had she discovered her; that it was the duty of the bark to have had a light ready to be shown, and to have instantly exhibited it over her stern or starboard quarter; that if she had done so the collision would have been avoided; that it was extremely difficult, if not impossible, for the steamer to discover the hull or sails of the bark till within too short a distance of her to clear her; that the green light of the bark was, necessarily, invisible to the steamer until she had got so near as to render a collision inevitable; that after the steamer discovered the bark's green light it was impossible for her to have gone astern of the bark; that the speed of the steamer was not measurable in

the state of the weather; and that she was, in fact, approaching the bark at a rate of less than eight miles an hour.

The proctor for the libelants, in connection with his brief in the district court, presented diagrams intended to show that whether the course of the steamer was W. $\frac{1}{2}$ N., while that of the bark was N. $\frac{1}{2}$ W., or that of the steamer was W. by N. $\frac{1}{4}$ N., while that of the bark was N. by W., the speed in both cases being, of the steamer, 12 miles an hour, and of the bark, 4 miles an hour, and the wind in both cases being W. by N., the green light of the bark was always in the view of the steamer, and its range towards the steamer always in front of abeam of the bark on her starboard side.

In reply to such brief and diagrams the proctor for the claimant contended, in a brief submitted to the district court, that the diagrams were inconsistent with the fact testified to by witnesses for the libelants, on the deck of the bark, that they saw all three of the lights of the steamer; that, according to the diagrams, they could not have seen her green light at any time when she was more than her length off; that the testimony of the witnesses for the libelants as to the line of the steamer's approach, as drawn by them on libelants' Exhibit A, in giving their depositions, was inconsistent with the theory contained in said diagrams as to the line of approach to the steamer; that such theory was inconsistent with the fact that several of the bark's crew saved themselves by climbing up the anchor-stock of the steamer, 25 feet abaft her stern on her port side, and with the testimony of the witnesses for the libelants that the steamer came up with and along-side of the bark at an acute angle; that if the steamer had been coming on a line ahead of a line two points abaft the beam of the bark, for the time the witnesses of the bark indicate, she would have gone astern of the bark; that if the green light of the bark had been open to the steamer for a mile or half a mile, as indicated by said diagrams, it was incredible that it should not have been seen from the steamer, and, when it was suddenly discovered, it would not have been seen, as it was, as a mere shine or halo, the color of which could not be made out; that the libel nowhere states that the green light of the bark was open to the steamer, or that the steamer might or should have seen it; that the averments of the libel as to the manner in which the steamer presented her lights to the view of those on the bark, and as to the part of the bark for which she was coming, show that she was overtaking the bark on a line making an acute angle with the course of the bark; that the alleged presentation to the bark of the three lights of the steamer was before the steamer had dis-

covered the bark, and therefore before the steamer had changed her wheel; that it was therefore obvious, as the bark was moving at a speed of four miles per hour, that if the steamer presented her three lights at the time testified to by the witnesses from the bark, she would have crossed the bark's line astern of the bark, unless she was approaching her at an acute angle; or, in other words, if the steamer, when first seen from the bark, was, as the libel states, coming for the stern part of the starboard quarter of the bark, she must have crossed the line on which the bark was sailing a considerable distance astern of the bark, unless she was coming at an angle much more acute than that made by the course of the bark, and a line drawn two points abaft her beam; that as, on the theory of the diagrams, the witnesses for the libelants testified untruly in saying that they saw the green light of the steamer as well as the other two lights immediately on discovering her, their testimony as to the course of the bark was not to be relied on; that the whole theory of the case as made by the witnesses for the libelants, and as illustrated by them on libelants' Exhibit A, proceeded on the view that the steamer was coming up with the bark from a point far astern of the points abaft her beam; and that to decide the case on the new theory presented by the argumentative diagrams would be to contradict the fourth article of the libel, and the testimony of the witnesses for the libelants, to discredit libelants' Exhibit A, used and sworn to by those witnesses before the commissioner, and to demonstrate that their statements that they ever saw the green light of the steamer were untrue.

The district judge, in his opinion, holds that the steamer was not approaching the bark from aft on a course that rendered it impossible for her to see the green light of the bark sooner than she did. He so holds because the answer states that the course of the steamer was W. by N. $\frac{1}{2}$ W., (that is W. $\frac{1}{2}$ N.,) and also states that the wind was W. by N., and also states that the speed of the steamer was between eleven and twelve knots an hour, and because on those facts, and the facts that the speed of the bark was from four to five knots an hour, and that she was bound to the westward and was sailing close on the wind, so that her course must have been from N. to N. by W., her green light, which was so arranged as to show two points abaft the beam, must have been visible to the steamer a considerable period of time before it was discovered by those in charge of her, and in abundant time to enable her to avoid the bark.

The application to amend the answer is opposed by the libelants, on an affidavit made by their proctor stating that in his oral argu-

ment before the district court he laid great stress on the direction of the wind and the course of the steamer alleged in the answer; that in his printed brief, afterwards submitted, he discussed the course of the steamer and argued that her correct course was that alleged in the answer; that this brief was replied to by the proctor for the claimant; that after the interlocutory decree was entered a commission was, in September, 1881, issued to Norway to prove the damages, and was executed and returned in December, 1881; that the purpose of amending the answer is to defeat, if possible, the findings of the district judge as to the relative courses of the vessel, the direction of the wind, the character of the lights seen on the bark by those on the steamer, and other particulars; that all the witnesses on both sides agree in fixing the wind as W. by N., and there is not a witness in the case who says that the wind was W. by S; that as to the course of the steamer the claimant has had all the information it now has since the evidence of the witnesses for the claim was taken in September, 1879; that no suggestion or application has ever been made until the present time to change the allegations of the answer as to the course of the steamer and the direction of the wind; that the witnesses for the claimant do not agree as to the course of the steamer; that the district judge having taken the course of the steamer to be that alleged in the answer, the claimant acquiesced therein while the case remained in the district court; and that to permit the amended answer to be now filed would be a hardship to the libelants, whose witnesses have scattered to different parts of the world, rendering it impossible to secure their attendance again.

It is plain that the averments of the answer as to the direction of the wind and the course of the steamer were held by the district judge to be conclusive to show that the green light of the bark was open to the steamer. But if the course of the steamer was W. by N. ¼ N., and the wind was as far to the southward as W. by S., and the course of the bark was as far to the westward as N. W. by N., or six points from the wind, then the course of the steamer was three points and three-quarters from the course of the bark, or at an angle of a little over 42 deg. to it. If the bark's course was N. W. by N., her green light showing two points abaft her beam on the starboard side would not be visible to the steamer heading W. by N. ¼ N. Even if the course of the bark was N. by W., the approach of the steamer, if she was heading W. by N. ¼ N., was from a direction a quarter of a point abaft of a line running from the bark two points abaft her beam, and thus from a direction almost coincident with the line of the green

light of the bark, so as to make necessary only a slight variation either way to throw the steamer on the dark side or the light side of that line. In fact, with the steamer heading W. by N. $\frac{1}{4}$ N., any heading of the bark to the westward of N. $\frac{3}{4}$ W. would make her green light invisible to the steamer.

A careful examination of the evidence on both sides has led me to the conclusion that the steamer approached the bark on a line more than two points abaft the beam of the bark, so that the green light of the bark was not visible to the steamer. When Larsen, the man at the wheel of the bark, took her wheel, the wheelsman whom he relieved gave him the course, not by the compass, but "by the wind;" that is, as close to the wind as the bark would lie and sail with her sails full. He is asked, in that connection, if he noticed her course by compass, and he says "Yes," and that she was "N. by W. and N. $\frac{1}{2}$ W. there between." This was apparently when he first took the wheel, and he does not say that he looked at the compass again. He had no occasion to do so, as he was steering by the wind. He says that the wind was about W. by N.

The concurring testimony of all the witnesses for the libelants is that the lights of the steamer appeared from abaft the starboard beam of the bark. Anderson marks the direction of the lights, and Larsen marks the direction of the blow. These lines make an acute angle of not over three points with the course of the bark. The angle of approach and the angle of collision were about the same, for the bark did not change her course, and the porting of the steamer's wheel did not materially change her course. All the evidence from the bark shows that the steamer approached at an acute angle on the quarter from aft. As all her lights were visible to the bark for several minutes, if she had been appproaching at near a right angle she would have gone astern of the bark. The bark must have been crossing obliquely the course of the steamer, ahead of the steamer, in the path in which all the steamer's lights were visible. The inevitable conclusion to be drawn from the many concurring facts testified to by the witnesses from the bark outweighs the statement of Larsen as to his observation of the compass course of the bark.

The evidence from the steamer shows that the second and fourth officers on the bridge, and two lookouts at their posts forward, were looking out ahead during the last four or five minutes before the collision, and that no one of them saw any light on the bark. It certainly would have been seen by some one of them if it had been within

range, unless all were negligent and inattentive.   The evidence shows
that they were not inattentive, and yet they saw nothing of the light
until the steamer was so close upon the bark that the collision hap-
pened, although the most prompt measures to avoid it were imme-
diately taken by the steamer.   What was seen when it was seen was
not the light distinct and green, but only a shimmer or glimmer or
sheen or halo, without clear impress of color.   The second officer
instantly ordered the helm hard a-port and blew the whistle.   Four
of the men on the bark heard the whistle just before the collision,
and some time after they had first seen the lights of the steamer.
The conclusion from the whole testimony as to what Zimmering, the
starboard-bow lookout, did is, that he reported the light by singing
out from forward and not by going to the bridge, just after the whistle
was blown.   That the light was first discovered from the bridge is
consistent with the fact that it was a feeble sheen, hovering on the
edge of the line of possible vision, and just coming into view beyond
it, as the steamer moved onward, and more quickly visible from an
elevation.   To hold that the steamer was approaching from forward
of abeam, requires it to be held that the four men of the steamer
failed to see the green light of the bark, plainly visible a long distance
off, and failed to observe it at all until a collision with the bark was
unavoidable.   This latter conclusion also results from holding the
claimant to the averments in the answer as to the direction of the
wind, involving the course of about N. by W. for the bark, without
permitting such amendments of the answer as will accord with the
proved facts, and· yet will not change the issues actually tried in the
court below on the evidence, and presented for trial in this court on
the same evidence.

On all the testimony from both vessels, the conclusion is irresisti-
ble and undoubting, that the steamer was approaching on a line
more than two points abaft the starboard beam of the bark, so that
her green light was not open, and there was nothing to indicate her
presence till her sails or hull should be seen, or the steamer should
run beyond the limit-line of the light.   It follows inevitably that the
statement in the answer as to the direction of the wind is erroneous.
None of the witnesses from the bark make out that with the light
breeze at the time the bark was sailing on a course within eight
points of the wind.   To hide her green light from the steamer, with
the course of the steamer W. by N. $\frac{1}{4}$ N., as it clearly was, the course
of the bark was not to the northward of N. by W.   W. by S. is eight
points from N. by W.   The aim of the bark was to sail as close to

the wind as she could, bound as she was to the westward, and any heading by her to the westward of N. by W., by her sailing closer to the wind than eight points, or by the wind drawing more away, tended to hide her green light more certainly from the steamer. It was an easy matter for those on the steamer to mistake the direction of the light wind. To the steamer, with its speed, the light wind would seem nearly ahead. The libel states no more definite direction of the wind than that it was "from the westward."

Criticism is made on the non-production as a witness of the port lookout on the steamer; but it is shown that he became insane and was discharged before the witnesses from the steamer were examined.

The case is a proper one for allowing the proposed amended answer to be filed. The statement of the answer as to the course of the steamer is shown to have been an accidental error. Its statement as to the wind should be allowed to be corrected as proposed, in view of all the established facts. The other amendments in the answer accord with the facts proved, and do not change the issues tried in the court below. It is not claimed that the libelants have any new or different testimony to produce. The witnesses on both sides were none of them examined before the district judge. The deposition of the fourth officer of the steamer, not produced before the district court, but produced before this court, strengthens the case for the steamer. In view of the conclusive force which the district judge gave to the averments and admissions in the answer, the case, on the amended answer and the evidence, does not fall within the principle of the cases where the dispute being one of fact, and the evidence being conflicting, and the witnesses having been examined in the presence of the district judge, the circuit court will not disturb the finding below.

The bark was clearly in fault in not making known her presence to the approaching steamer. Those on the bark saw the three lights of the steamer advancing in a direction and with a persistence indicating that the steamer did not and could not see the green light of the bark, or be aware of the presence of the bark. Under these circumstances it was the duty of the bark to indicate her presence by some means. The exhibition of a light flashing or flaming up would have done so. Other means might have done so. Any proper means used seasonably after those on the bark saw the steamer approaching would have arrested the course of the steamer or have enabled her to avoid the bark.

The speed of the steamer was not improper when the weather was such that proper lights could be seen from one to two miles off when within range. The steamer had a right to assume that a vessel which she was overtaking, and whose lights were invisible to her, and who could see her advancing lights, would make known her presence in season for a steamer going at not more than ordinary ocean speed in such weather to avoid a collision. The order of hard a-port on the steamer produced no material change in the course of the steamer, and did not contribute to the collision. At the distance off at which the steamer ported there was clearly no chance of avoiding the collision by starboarding, and in view of the angle at which the steamer was approaching there was a chance of less disaster to the bark by reducing that angle by porting than by increasing it by starboarding. The steamer stopped and reversed instantly on seeing what there was of the light, and that was seen as soon as could be seen.

The libel must be dismissed, with costs to the claimant in both courts.

---

Motion for rehearing having been made, the following opinion was handed down:

C. Van Santvoord and Henry T. Wing, for libelants.

W. G. Choate, for claimant.

BLATCHFORD, Justice. I have carefully reviewed this case and see no reason for altering the findings and conclusions and decision heretofore made in it by me. [After commenting in detail upon the fresh findings of fact and conclusions of law proposed by the libelants, the court goes on to say:] It is a proper conclusion, from all the testimony in the case, that the seeing of the light of the bark, the order to hard a-port, the whistle, and the order to stop and back at full speed, followed each other in immediate and rapid succession, as rapidly as they could be given, and in the above order. There was no interval between the whistle and the order to go full speed astern. There was no interval between the order to go half speed astern and to go full speed astern.  *  *  *

The suggestion that the purport and effect of the evidence were misapprehended by the court from want of proper reference to the testimony, does not, on full consideration, seem to be a correct observation, and it does injustice to those who represented the libelants as counsel on the first hearing in this court. The case could not

have been presented with more thoroughness and ability on the part of the libelants than it was then presented, and any failure of success then was because the case was not with the libelants, and not because of any incompetency or inadequacy of counsel.

It is not perceived that the court erred in deciding that the course of the bark was further to the westward than N. by W. The course of the steamer being fixed at W. by N. ¼ N., the course of the bark depended on the direction of the wind. What her course was is to be determined by all the evidence bearing on the point as to whether the line of approach of the steamer was a line more than two points abaft of the starboard beam of the bark, as well as by the direct evidence that the course of the bark was so and so, and that the direction of the wind was so and so. Nor is it perceived that the court erred in deciding that the line of approach of the steamer was such as to shut out the green light of the bark. No foundation is seen for the theory that the steamer circled round to the northward, and followed up the bark till she overtook her. The porting of the wheel of the steamer hard a-port did not change her course to any material extent before the collision. The vessels were very close together before the light of the bark was seen at all by those on the steamer. The evidence shows that there would have been no different result if the order to reverse at full speed had preceded the order to hard a-port. Moreover, as the concealment of the bark by herself from the steamer till the flash of the bark's light appeared created a necessity for the steamer to suddenly determine what the light was, and what to do in the emergency, when the vessels were very close together; and as the officer in charge of the steamer believed that the light was the white light of a steamer, and acted on that belief, and so ported to the light seen on his port bow, his error of judgment, if any there was in so porting before reversing, cannot be imputed to the steamer as a fault.

The evidence is that four of the men on the bark heard the steamer's whistle just before the collision, and that they heard that whistle some time after they had first seen the steamer's lights; and, as that whistle marks the time when the bark's light was first seen from the steamer, there is no foundation for the view that the steamer saw the light of the bark before the bark saw the lights of the steamer.

No error is perceived in the conclusion that there was a proper lookout kept on the steamer. All the questions involved in this case, which seem to have a bearing on the issues, were so fully considered

in the decision before filed, that it is not deemed necessary to enlarge on them. The application for a rehearing is denied.

*September 9, 1882.*

See same case in district court, 8 FED. REP. 172.